Filed 11/17/22  Santiago v. Lamont Elementary School Dist. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MARY SANTIAGO, | F081465 |
| Plaintiff and Appellant, | (Super. Ct. No. BCV-17-100875) |
| v. | |
| LAMONT ELEMENTARY SCHOOL DISTRICT, | **OPINION** |
| Defendant and Respondent. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett, Judge.

Law Offices of Parnell Fox and Parnell Fox for Plaintiff and Appellant.

Herr Pedersen & Berglund, Leonard C. Herr and Caren L. Curtiss for Defendant and Respondent.

-ooOoo-

Mary Santiago (plaintiff) was employed as a receptionist by the Lamont Elementary School District (defendant) for 19 years.  She had tardiness and attendance issues throughout her career, especially during her last three years on the job.  Aside from occasional warnings, defendant was generally tolerant of those issues until plaintiff was

discovered to have secretly recorded a meeting with defendant's assistant superintendent. She was placed on administrative leave pending a formal investigation and was ultimately fired for cause. The stated grounds for dismissal included "chronic attendance and punctuality deficiencies" and "insubordination" in connection with the recorded meeting.

Plaintiff sued defendant for disability discrimination under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). In addition to other related FEHA claims dependent upon the existence of a disability, she also pleaded a whistleblower claim under Labor Code section 1102.5. Plaintiff alleged her firing was in retaliation for "refusing to cooperate in covering up a $300,000 misappropriation of funds," and for having discovered and reported that the assistant superintendent lied about his credentials in his employment contract with the school district. The Labor Code claim was summarily adjudicated in defendant's favor prior to trial. Defendant successfully moved in limine to exclude any evidence concerning the whistleblower allegations during trial, leaving plaintiff to rely solely upon her disability contentions.

A jury found plaintiff did not have a physical or mental disability that limited her ability to perform the essential functions of her job. This finding was dispositive of all remaining causes of action, and judgment was entered for defendant. Plaintiff now seeks reversal and a new trial on the ground of insufficient evidence. In essence, she claims the existence of a qualifying disability was proven as a matter of law.

The evidence showed plaintiff was treated for multiple ailments during the relevant time period: allergic rhinitis, chronic fatigue syndrome, depression, fibromyalgia, gastroesophageal reflux disease, reactive airway disease, and type 2 diabetes. However, plaintiff failed to develop or substantiate the argument that those conditions had a limiting effect on her job performance. For example, during opening statements plaintiff's counsel attributed her persistent tardiness to "taking medication that took time to [take] effect to stop her from vomiting so she [could] go to work." But no

2.

evidence of such vomiting was ever presented or even alleged by any witnesses, including plaintiff herself. She only briefly testified that a later start time would have enabled her "to take my medication early in the morning and allow to effect [*sic*] so that way I could make it to work on time." She never explained what the medication was, the symptoms it controlled, or how long it took to take effect.

The existence of a qualifying disability was closely tied to the issue of plaintiff's credibility, which was called into question in several ways. Further supporting the jury's verdict was plaintiff's admission, under oath, that her health problems "didn't affect my ability to do my job." We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was hired by defendant as a permanent full-time receptionist in November 1995. She and her coworkers in the small office of the rural school district were frequently asked to perform tasks outside of their job classification. Over time, plaintiff's job duties consisted of not only greeting visitors and answering phones, but also secretarial work, data entry and analysis, preparation of reports, and interpreter/translation services (she was bilingual in Spanish and English).

Plaintiff's "frequent tardies" were documented as early as 1996. In her 2003 and 2010 performance evaluations, plaintiff's attendance was rated below average. Her attendance rating improved to average in 2011, but she was "counseled that there was concern over her attendance and the fact she was not contacting the office when she was late or not showing up at all."[1]

Ricardo Robles was hired as defendant's superintendent in 2011. Jose Cantu became the assistant superintendent on July 1, 2012, the first day of the 2012–2013 school year. Robles and Cantu thereafter shared the responsibility of overseeing plaintiff's job duties.

---

[1]The information in this paragraph is provided for general background purposes. At trial, plaintiff successfully moved to exclude any evidence of her attendance record prior to 2012.

3.

From at least July 2012 onward, plaintiff was better about calling the office when running late. The record on appeal contains over 60 e-mails memorializing phone conversations between plaintiff and the employee who documented late arrivals. The employee testified to typing the e-mails and sending them to Cantu (and usually the rest of the office) immediately upon hanging up with plaintiff. The correspondence thus reflected the time plaintiff had called in and the explanation she provided for being late.

During the last four months of 2012, plaintiff was late for work at least 18 times. Her daily start time was 7:30 a.m., but she typically waited until between 7:45–8:00 a.m. before calling to advise that she was behind schedule. In most instances, plaintiff merely claimed to be "running late." The e-mails show only two full-day absences between August 2012 and the end of the calendar year. Both absences were generically attributed to being "sick."[2]

On January 2, 2013, plaintiff was absent from work. The record suggests Cantu was not expecting plaintiff to be out and questioned her about it. On January 3, 2013, at 1:45 a.m., plaintiff sent Cantu the following message: "Happy New Year! [¶] I will be out of the office this week on vacation. [¶] My doctor's appointment was a personal appointment, not sure why I would need to bring in a doctor's note on my release since I was not under doctor's care. [¶] Please clarify the request for a doctor's note."

Cantu replied to plaintiff's message at 7:22 a.m.:

"Good Morning, [¶] I'm concerned about your attendance …. Your health is your business, however if your health is the major issue which seems to be impeding your attendance, we can ask for a doctor's note. If it was personal, personal days are available but you may be out of those too. This was my first attempt to get at my continued concerns about your attendance and tardiness. My concerns have escalated now that you want to take vacation. [¶] I look forward to meeting with you upon your return."

---

[2]In deposition testimony, plaintiff estimated she had more than 50 absences during the 2011–2012 school year. There is no indication of how many of those absences may have been for health reasons. Plaintiff's official attendance records for the 2011–2012 and 2012–2013 school years are not part of the record on appeal.

Superintendent Robles was copied on Cantu's message to plaintiff. Several hours later, plaintiff wrote back:

"Good Afternoon Mr. Cantu, [¶] In response to your request I've scheduled an appointment with my primary doctor. I have an appointment on Tuesday [1/8/13] at 4pm and will need to leave the office at 3:15pm. I will have them fax you a copy of the doctor's note as per your request of the outcome of my appointment addressing your concerns."

On January 8, 2013, Cantu e-mailed plaintiff with a request for her "Attendance History 2012–2013 Card and accompanying Absence Request Forms for the last month." Later that afternoon, plaintiff obtained a note from her primary care physician, Rosemarie Dellica, M.D. (Dr. Dellica). The note did not specifically address plaintiff's absences or tardiness. It read:

"To whom it may concern:

"[Plaintiff] has been under my care since 10/2/2012. She has been treated for the following medical conditions:

"— Chronic fatigue syndrome

"— Fibromyalgia

"— Depression anxiety

"— Reactive airway disease and allergic rhinitis

"— Diabetes mellitus type 2

"— Gastroesophageal reflux disease"[3]

---

[3]Plaintiff's attorney has frequently characterized these ailments as "serious medical conditions." We refrain from using the term "medical condition" because of its unique definition under the FEHA. "FEHA defines 'medical condition' as either '[a]ny health impairment related to or associated with a diagnosis of cancer or a record or history of cancer' or a genetic characteristic. [Citations]." (*Soria v. Univision Radio Los Angeles, Inc*. (2016) 5 Cal.App.5th 570, 584.) Although plaintiff once alleged her doctors had "flagged [her] as a high risk for stomach cancer," her causes of action were based on the existence of a physical and/or mental disability as defined by Government Code section 12926, subdivisions (j) and (m). She did not allege or attempt to prove the existence of a "medical condition" within the meaning of section 12926, subdivision (i). (See *Soria*, at p. 584 ["Under FEHA medical condition and physical disability are separate bases for improper discrimination, each with its own statutory definition"].)

5.

On January 28, 2013, Cantu sent a group message to six employees, including plaintiff, regarding the "need to be better organized in terms of when we can expect folks to be at their respective desks" to ensure the constant presence of someone to answer phones and cover the front counter. The employees were asked to provide their regular work hours and break times. Plaintiff wrote back confirming her schedule of 7:30 a.m. to 4:00 p.m., with a morning break at 9:30 a.m.; a 30-minute lunch from 11:30 a.m. to 12:00 p.m.; and another break at 2:30 p.m.

Plaintiff was significantly late for work approximately 40 times during the 2013 calendar year. As before, she often waited until she was already 15 to 30 minutes behind schedule before calling in to the office. Many of her excuses were distinctly nonmedical in nature. Examples included "fog," "received a phone call that her sister-in-law is not doing too well," "a small emergency at her daughter's apartment," "needs a ride," "carless [and] trying to get a ride," "board meeting finished late last night," "personal business came up," "couldn't find the keys to the car," "[car] battery is dead," "son had a flat [tire]." There were a dozen occasions when no explanation was given. The relatively few health-related excuses were vague and/or had no clear relationship to the afflictions listed on Dr. Dellica's earlier note, e.g., "woke up with a headache," "feeling sick," "lower back is bothering her," "needs to go buy pills for her ear infection," "not feeling well."

Plaintiff accounted for her late arrivals, early departures, and absences by using quarter hour (.25) increments of sick leave and vacation time. She occasionally used "personal emergency" time, which the record indicates was essentially sick leave for reasons unrelated to illness ("P.E." hours were apparently deducted from an employee's available amount of sick leave). Plaintiff typically provided one of four generic explanations on her time card, which the payroll clerk would later transcribe on her official attendance record: "ill," "sick," "personal," or "vacation." However, plaintiff would give the reason of being "ill" even when the corresponding event had nothing to

6.

do with her health.  For example, she wrote "ill" as the reason for being 30 minutes late after previously claiming to have been helping her son jump-start his car.  The same was true of 1.25 hours of sick leave used for what she had previously said was "car trouble."  Likewise for 1.75 hours of leave used because of an early departure originally attributed to her daughter having been in a "car wreck."

The 2013–2014 school year began with plaintiff being absent for 10 straight days (not including the Independence Day holiday).  She used 32 hours of vacation between July 1 and July 5, 2013.  On Monday, July 8, plaintiff called the office at 8:05 a.m. to say she would be out and "might not be in tomorrow" because she was "packing her stuff [and] moving out of her apartment."  This event coincided with a period of separation from her husband.  On Tuesday, July 9, plaintiff called in around 2:00 p.m. to advise she would be "out for the rest of the week as per the doctor."  On the same day, she obtained a note from Dr. Dellica that said, "Excuse from work from 7/9/13 until 7/12/13 due to medical reasons.  Return to work on 7/15/13."

The following Monday, July 15, 2013, plaintiff called the office at 8:08 a.m. to say she was not coming in.  She claimed to have previously requested "to have last Friday and this Monday off," and explained that she had gone out of town to attend a wedding.  Three days later, on July 18, plaintiff used 4.5 hours of sick leave for an unspecified reason.  On July 19, she used 2.5 hours of sick leave to attend a "Cardiologist appointment."  On July 24, plaintiff called in to say she was "taking a personal day."  However, according to her official attendance record for that date, she reported only 1.5 hours on her time card and designated it as sick leave.  On July 29, plaintiff e-mailed a message to the entire office:  "I apologize for the short notice, I was informed yesterday morning that my brother in law passed away and his services are this morning.  I will be leaving at 9:30 am and be returning sometime after lunch."

On August 1, 2013, plaintiff used one hour of sick leave to attend a doctor's appointment.  The next week she arrived late to work "due to illness" and used another

7.

2.5 hours of sick leave.  On August 20, Cantu sent plaintiff the following e-mail:  "I would like to meet with you [today].  Please bring any time slips for off duty time taken since July l, 2013 and your Time Card."  The record does not reveal what was discussed at the meeting.  Plaintiff subsequently went on vacation from August 22 through 27.  On August 28, she took a sick day.

Plaintiff's attendance worsened in September 2013.  On September 4, she blamed a late arrival on "feeling sick" but later covered the time with one hour of personal leave.  She was late the next day because her "car wouldn't start."  On September 6, she used 30 minutes of sick leave.  There was another three-day sequence of late arrivals the following week (9/10, 9/11, 9/12).  The first excuse was that her son's car "needed a jump"; the second was waking up "with a huge headache"; the third is unspecified in the record.

On September 20, 2013, plaintiff arrived 30 minutes late for an unspecified reason.  On September 23, plaintiff left work at 8:26 a.m. due to an alleged "double ear infection" and did not return.  She called in late at 7:45 a.m. the next day but did not report the tardiness on her time card.  She was late again the following day, citing the need "to go buy pills for her ear infection," and used 2.25 hours of sick leave.  On September 30 plaintiff reportedly attended morning and afternoon doctor's appointments, for which she had provided advance notice the previous week, but her attendance record showed only 15 minutes of sick leave for that day.

The trend continued.  Plaintiff used 15 minutes of sick leave on October 2, 2013.  On Friday, October 4, she did not arrive until 8:45 a.m. due to alleged car trouble.  The following Monday she used three hours of sick leave, but the appellate record does not explain why.

On October 8, 2013, plaintiff e-mailed her superiors and colleagues to advise she would be leaving at 10:30 a.m. the next day to attend "multiple appointments."  She used five hours of sick leave on October 9 and was evidently 30 minutes late on October 10

8.

(the attendance record indicates .5 hours of sick leave used). On the latter date, plaintiff exchanged personal e-mails with a friend regarding "a pain in the pit of [her] stomach" and plans to see her "gastro doctor" at 9:00 a.m. the next day. Plaintiff referenced a diagnosis of hiatal hernia and expressed concern she might have an ulcer. The messages also discussed plaintiff's relationship problems with a man she had been seeing. The friend wrote, "[M]aybe some of your stomache problem [*sic*] are because of him." Plaintiff replied, "I know they are, I was so stressed out because of all his stupid little games."

On October 11, 2013, plaintiff called the office at 10:00 a.m. to advise she had just seen her doctor, needed to "get blood work done," and would "be in right after." At 2:28 p.m., plaintiff called back to explain she had returned to the doctor's office and would not be coming to work. She used eight hours of sick leave to cover the absence, which at that point exceeded her total amount of available sick leave for the year.

On October 16, 2013, plaintiff used a vacation day for the unverified purpose of attending medical appointments. Later in the month, she used a total of 2.75 vacation hours to cover late arrivals and early departures on four separate days (1.75 hours were attributed to her daughter's "car wreck"). On October 27, Cantu e-mailed plaintiff with instructions to update her time card.

On November 1, 2013, plaintiff used four hours of vacation for reasons not specified in the record. Cantu e-mailed plaintiff the same day regarding two issues: "a new schedule for front counter coverage" and the submission of her time card. Part of the message said, "I will expect the card every last day of the month, every month. Be sure to attach all of the necessary documents for absences incurred since the last time I initialed and reviewed your card."

On November 4, 2013, Cantu sent an e-mail to all personnel announcing a reassignment of duties among various employees. The next morning, November 5, plaintiff sent him a private response: "I apologize to inconvenience the district, but

9.

unfortunately I cannot attend Board meetings. I need to cut back on any extra work and relieve some of the stress as a result from my doctor visit yesterday afternoon. [¶] I will be following up with my primary doctor. They have flagged me as a high risk for stomach cancer unless I become proactive in lowering the stress level and continue medication to heal the erosion in the esophagus. [¶] Again, I apologize for the inconvenience but I must do what I must to take care of my health." Cantu wrote back: "I appreciate your concerns about your health. … Can we talk about adjusting your work hours on Board Meeting days so that you report later in the day and attend the meeting? That would allow you some time to rest in the morning and not have to work a 12 or 13 hour day."[4]

As indicated by her official attendance record, plaintiff was subsequently late for work (or possibly left early) on November 6, 8, 12, and 14. Those incidents corresponded to her use of an additional 1.75 vacation hours. On November 20, 2013, Superintendent Robles met with plaintiff and issued a verbal warning regarding her tardiness and absenteeism. Two days later, plaintiff e-mailed Cantu to advise she would be leaving work an hour early on December 4, 2013, for a doctor's appointment. He wrote back, "No problem. Hope everything turns out ok. Very proud of the way you finished the week!" Plaintiff replied, "Going for a second opinion. Prior doctor for the last 10 years has not been proactive."

On December 6, 2013, Cantu e-mailed plaintiff the following message: "Thank you for all the work you have done this week and the change I've witnessed in the last two weeks. … Your dedication, effort, and time management have gotten my attention

---

[4]Plaintiff had previously complained about tasks related to monthly meetings of defendant's Board of Trustees (school board), i.e., its governing body. She estimated that for over seven years it was her responsibility to prepare the "board packets," i.e., binders of informational materials distributed to school board members in advance of the meetings. In an e-mail to Superintendent Robles dated May 23, 2013, plaintiff wrote, "I am going home on stress. I need to meet with you tomorrow morning to discuss and turn in paperwork on concerns that I have regarding board packet and the stress that this has created."

10.

and the attention of our Superintendent." Plaintiff subsequently missed four hours of work on December 9, and missed additional time on December 12, for reasons not explained by the record.[5]

On December 10, 2013, a holiday schedule was distributed to the entire office. It listed the planned absences of all employees for Monday, December 23, 2013, through Monday, January 6, 2014. Plaintiff was one of several people scheduled to be on vacation from January 2–3. With regard to January 6, it was noted "[Plaintiff] will have surgery this day and will be out of the office for 2–4 weeks, depending on recovery."

On January 6, 2014, plaintiff underwent surgery to repair a hiatal hernia. Approximately three days later, while plaintiff was out on her scheduled leave, Superintendent Robles mailed a letter to her home. The pertinent contents were as follows:

> "Re: Written Warning
>
> "On November 20, 2013 a meeting was held to discuss your attendance and punctuality issues along with a discussion involving the reassignment of duties to and from your desk. As part of that meeting you were given a verbal warning regarding excessive use of sick leave and excessive tardies. At the time of the meeting you had already used all available and accumulated sick leave for the 2013–2014 school year.
>
> "In December 2013, your pattern of tardiness and absenteeism did not change. The following are documented examples of your conduct in the month of December:
>
> "December 4, 2013—Departure from work due to Dr. Appt. at 3:00 p.m.
> "December 9, 2013—Report to work at 11:30 a.m.
> "December 12, 2013—Report to work at 7:45 a.m.
> "December 30, 2013—All day absence
>
> "The 13.75 hours that you were away from your post will be removed from your, pre-December, 2013, existing Vacation Leave balance

---

[5]Plaintiff was reportedly 15 minutes late on December 12, 2013, but the official attendance record shows her use of 6.75 hours of vacation time for that day.

11.

of 29.88 hours.  Once an employee's personal time has been used, the employee's salary is adversely effected [*sic*].

"This letter serves as a Written Warning regarding your excessive and repeated absence and tardiness issues.  The District is following a progressive discipline model which means that if your conduct continues, the next steps will be a Written Reprimand followed by a Suspension Without Pay or Demotion.  The Lamont Elementary School District expects all employees to report to work punctually and to not exceed their allotted sick leave in a given year.  At this time you are directed to report to work at 7:30 a.m. and to leave at 4:30 p.m..  Any appointments with physicians will require a note verifying the date and time that you were in the physician's office."[6]

On January 13, 2014, Cantu e-mailed plaintiff the following message:

"Happy New Year and Welcome Back.  If you are reading this, you are likely back in the office having recovered from your surgery.  Glad to hear that you recovered quickly.  At your earliest convenience please complete the paperwork for your time away from the office and complete your time card for December through present date."

On January 21, 2014, plaintiff met with Dr. Dellica and obtained from her the following note:  "To whom it may concern:  [Plaintiff] was seen on 12/30/2013 for medical treatment."  As far as the record shows, plaintiff did not obtain corroborating documentation for December 4, 9, and 12, 2013.

In a note dated January 23, 2014, plaintiff's surgeon authorized her return to work on February 17, 2014.  However, plaintiff subsequently asked Dr. Dellica to vouch for an extension of her leave of absence.  Dr. Dellica's note, dated February 14, 2014, said, "Excuse from work from 2/18/14 until 3/09/14 due to medical reasons.  [¶] Return to work on 3/10/14."

Plaintiff returned to work on March 10, 2014.  That afternoon, Cantu sent her an e-mail about meeting "to discuss your job duties going forward."  The meeting was held in Cantu's office the following day.  According to both parties, the purpose and substance of the meeting concerned a reallocation of job duties among and between plaintiff and

---

[6]At trial, plaintiff erroneously testified this letter instructed her "to report to work immediately."

certain other employees. Cantu later sent an e-mail to all personnel detailing the change in job duties for plaintiff and two of her coworkers. Plaintiff's responsibilities now consisted of "Front Desk Receptionist duties," "School records," "School Messenger," "Translation Services," "Expulsions and Suspensions," "Worker's Compensation Forms and Reports," "Use of Facilities," and "Substitute Teacher Contacts." Among other changes, preparation of the "School Board Packet" was reassigned to an administrative secretary. (See fn. 4, *ante*.)

On March 11, 2014, following her meeting with Cantu, plaintiff contacted Jesus (Jesse) Atondo. Atondo was a member of the school board and a longtime personal friend of plaintiff. While venting to Atondo about her revised job duties, plaintiff disclosed that she had made an audio recording of the meeting with Cantu. Despite their friendship, Atondo reported the existence of the recording to Superintendent Robles and the school board. He prepared and signed the following statement:

> "To the Superintendent of the Lamont Elementary School District:
>
> "On Tuesday, March 11, 2014 employee [plaintiff] brought to my attention an audio recording of her superior Jose Cantu. In the recording that I observed in my office …, [plaintiff] played back to me an exchange Cantu had with her early in the afternoon. In the audio being played from her cell phone, the conversation consisted of her job performance and her job duties she was being assigned. [¶] Questions or concerns on this issue, please feel free to contact me directly."

Superintendent Robles consulted with defendant's legal counsel about the audio recording. Atondo pushed for a formal investigation into the matter, viewing it as an unlawful "violation of trust." When Cantu learned of the recording, he contacted the Kern County Sheriff's Office. Plaintiff, meanwhile, was apparently unaware of these developments.[7]

---

[7]Penal Code section 632 prohibits the intentional recording of a "confidential communication" without the consent of all involved parties. Although defendant maintains plaintiff violated this statute, the record contains no evidence of plaintiff ever being charged with a crime. We express no opinions regarding defendant's allegations of criminal behavior.

13.

On April 2, 2014, Cantu included plaintiff on an e-mail to several employees regarding the importance of keeping breaks within "the assigned time periods." Although nobody was singled out in the message, it touched upon another of plaintiff's recurring issues with "punctuality." According to the testimony of a colleague in whom she had confided, plaintiff had a history of taking excessively long breaks and lunches to spend time with her romantic partner.

Between April 11 and 15, 2014, plaintiff used 20 hours of bereavement leave attributed to the death of her sister-in-law. She also used 16 hours of personal leave on April 24 and 25. On May 9, 2014, plaintiff obtained a note from Dr. Dellica excusing her from one day of work "due to medical reasons."

On June 3, 2014, defendant's business director e-mailed plaintiff this message: "You left work today (6/3) at 11:30 a.m. for lunch and did not return—no notice (verbal or written) was provided regarding your intent not to return. [¶] Please see me regarding your absence." Plaintiff later used 3.5 hours of sick leave to account for her time away. On June 12, the business director sent another e-mail: "We have verbally discussed your lunch hour schedule and the importance of strict adherence. It is not being practiced. … You are expected back at your desk promptly at noon. … Those who relieve you at the desk have their own personal matters that they attend to during their duty free lunch, which begins at noon. You're [*sic*] inability to return at noon impacts them directly. In order for all of us to work effectively and harmoniously, we must strictly adhere to our lunch schedule, and the same holds true for your morning and afternoon breaks."

On June 18, 2014, plaintiff was placed on administrative leave pending further investigation into her recording of the meeting with Cantu. In August 2014, she was served with a "Statement of Charges and Recommendation For Dismissal," which included notice of a *Skelly* hearing.**8** Among other allegations, plaintiff's "attendance and

---

**8**"In [*Skelly v. State Personnel Bd*. (1975) 15 Cal.3d 194], the California Supreme Court held that in order to satisfy due process, an agency considering disciplinary action against a public employee must accord the employee certain 'preremoval safeguards,' including 'notice of

punctuality" were described as unsatisfactory "[s]ince at least August 12, 2012." She was accused of secretly recording the meeting with Cantu on March 11, 2014, which was alleged to constitute insubordination and a violation of defendant's policies and/or procedures.

On August 26, 2014, plaintiff attended the *Skelly* hearing and reportedly asked for a continuance. The continued hearing was set for the following month, but plaintiff failed to appear. In November 2014, plaintiff retained legal counsel and the *Skelly* hearing was continued again at her attorney's request. In December 2014, plaintiff's attorney referred her to a psychologist, Edwyn Ortiz-Nance, Psy.D (Dr. Ortiz-Nance).

The *Skelly* hearing was finally held on March 13, 2015, and the outcome was adverse to plaintiff. She pursued an administrative appeal. The school board conducted a de novo hearing and unanimously sustained the charges against her. Plaintiff's employment was terminated effective April 30, 2015.

In April 2017, plaintiff sued defendant, Robles, and Cantu. Six causes of action were alleged against defendant under the FEHA: (1) disability discrimination; (2) disability harassment; (3) failure to engage in the interactive process; (4) failure to accommodate a disability; (5) retaliation; and (6) failure to prevent discrimination, harassment, and retaliation. A seventh cause of action alleged retaliation by defendant in violation of Labor Code section 1102.5 (the whistleblower claim). (See *Lawson v. PPG Architectural Finishes*, *Inc*. (2022) 12 Cal.5th 703, 709 [Labor Code "Section 1102.5 provides whistleblower protections to employees who disclose wrongdoing to authorities"].)

---

the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline.' [Citation.] The Supreme Court's directive gave rise to an administrative procedure known as a *Skelly* hearing, in which an employee has the opportunity to respond to the charges upon which the proposed discipline is based." (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 280.)

In April 2018, defendant prevailed on a motion for summary adjudication of the whistleblower claim. This outcome resulted from a procedural misstep, i.e., plaintiff's failure to comply with the prelitigation notice requirements of the Government Claims Act (Gov. Code, § 810 et seq.). The remaining causes of action were tried to a jury in February 2020.

As indicated by an exhibit list filed at the time of trial, plaintiff had intended to proffer evidence related to her whistleblower allegations. However, defendant prevailed on motions in limine to exclude all such evidence. Those rulings are not challenged in this appeal.

During trial, plaintiff attempted to prove that the assertedly secret nature of her audio recording was both untrue and a pretextual basis for her firing. Plaintiff testified Cantu appeared to be recording the meeting on his own device, and he had known and consented to what she was doing. She explained, "I recorded the meeting because I thought I was being recorded, and I wanted to make sure that I had a copy of the same recording." Plaintiff also testified to deleting the recording before becoming aware of the controversy over her actions. She allegedly "saw no need [to preserve] it" after Cantu sent the e-mail "identifying all of the details that surrounded that meeting."

Cantu denied recording the meeting himself or consenting to being recorded by plaintiff. He testified to a lack of knowledge of the recording's existence prior to Atondo coming forward with the information. Atondo also refuted plaintiff's version of events. He testified: "She showed up at my office excited that she had tape recorded Mr. Cantu. She admitted to me that she secretly taped Mr. Jose Cantu and she had it on her audio phone and she replayed it."

To prove she was disabled, plaintiff elicited testimony from Drs. Dellica and Ortiz-Nance. Plaintiff also testified on her own behalf. Further details are provided in the Discussion, *post*.

The defense showed that plaintiff had an active social life throughout 2013. She enjoyed spending nights in bars, dancing, and participating in "karaoke music." She admitted to doing this "[o]nce or twice a week," including worknights, and staying out until 11:00 p.m. while still maintaining a daily routine of getting up at 5:30 a.m. Defense counsel asked, "Did you ever find it is a little difficult the older you get to stay out till 11 o'clock at night going and doing karaoke and dancing and whatever and having to get up at 5:30 the next morning?" She replied, "No. Actually, it was a stress reliever."

Both sides called plaintiff as a witness. On direct examination by the defense, she was asked, "[I]t is true, is it not, that you never had a disability that affected your ability to do your job while you worked [for defendant]?" When plaintiff disagreed with the statement, the defense impeached her with prior deposition testimony. Plaintiff had been asked in deposition whether she had "a disability that affected your ability to perform the core functions of your job?" Her response was, "I had a disability, but it didn't affect my ability to do my job."

On cross-examination, plaintiff's counsel attempted to qualify the admission. After reciting the deposition testimony, counsel asked, "What did you interpret core functions of your job to mean?" Plaintiff answered, "My original position of district receptionist." The next question was, "Did you feel that your job, as it evolved over time into a much larger position, did you have difficulty performing those duties without accommodation?" Plaintiff answered, "Yes, I did." No further explanation was provided.

The defense moved for a nonsuit as to the lone cause of action against Robles and Cantu (disability harassment). While the motion was pending, plaintiff agreed to dismiss the claim in exchange for a waiver of fees and costs. The settlement did not affect the causes of action against defendant.

The parties devised a special verdict form consisting of 27 questions.[9] The first three questions were presented as potentially dispositive issues. The first question addressed an undisputed issue: whether defendant was plaintiff's employer. The second and third questions read as follows:

> "2. Did [plaintiff] have a physical or mental disability that limited her ability to perform her essential job duties? [¶] … [¶] If your answer to this question is yes, then answer the next question. If you answered no, answer no further questions, and have the presiding juror sign and date this form.

> "3. Did [defendant] know that [plaintiff] had [a] physical or mental disability that limited her ability to perform her essential job duties? [¶] … [¶] If your answer to this question is yes, then answer the next question. If you answered no, answer no further questions, and have the presiding juror sign and date this form."

The jury's deliberations were relatively brief—approximately one hour by defendant's estimate (which plaintiff does not dispute). By a vote of 11 to 1, the jurors answered "No" to the second question. In other words, the jury found plaintiff did not have "a physical or mental disability that limited her ability to perform her essential job duties." Judgment was subsequently entered in favor of defendant.

Plaintiff moved for a new trial, arguing the "uncontroverted evidence proves she established she had a disability that limited her ability to perform the essential functions of her job." There are no transcripts of any hearings on the new trial motion in the record. Although somewhat unclear, it appears the motion was denied by operation of law. (See Code Civ. Proc., § 660, subd. (c).)

---

[9]In her opening brief, plaintiff alleges "[p]reparation of the special verdict form was contested." However, as she generally concedes, the only dispute was over the inclusion or omission of "the titles of the causes of action." Defendant alleges, and the record arguably indicates, the substantive content was drafted by plaintiff's counsel. In any event, plaintiff's briefing makes clear that she is not alleging error in relation to the verdict form.

**DISCUSSION**

I.      **Overview**

        **Definitions**

The "FEHA defines 'disability' as a physical or mental condition that 'limits a major life activity,' such as working. [Citation.] 'Limits' is synonymous with making the achievement of a major life activity 'difficult.'" (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 733, citing Gov. Code, § 12926, subds. (j), (m)(1)(B)(ii).) Working constitutes a major life activity "regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." (Gov. Code, § 12926.1, subd. (c).) "'Essential functions,'" which is a term relevant to disability claims under the FEHA, "means the fundamental job duties of the employment position the individual with a disability holds or desires." (*Id.*, § 12926, subd. (f).)

"As disjunctively defined by FEHA, a person is 'physically disabled' if, among other things, the individual (1) has a physiological condition that both (a) affects a specific bodily system and (b) limits a major life activity; (2) has a 'record or history of' such a physiological condition; or (3) is 'regarded or treated by' the individual's employer as having, or having had, any condition that makes achievement of a major life activity difficult, or as having, or having had, a physiological condition that is not presently disabling, but that may become so." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 46.)

"A qualifying '"[m]ental disability"' under FEHA includes 'any mental or psychological disorder …, such as … emotional or mental illness' that 'limits a major life activity.'" (*Higgins-Williams v. Sutter Medical Foundation* (2015) 237 Cal.App.4th 78, 83–84, quoting Gov. Code, § 12926, subd. (j)(1).) Here again, the statutory definition broadly encompasses both actual disability and "[b]eing regarded or treated by the employer … as having, or having had, any mental condition that makes achievement of a

major life activity difficult." (Gov. Code, § 12926, subd. (j)(4).) Also included is any mental or psychological disorder "that requires special education or related services." (*Id*., subd. (j)(2).)

## II. Plaintiff's Theories of Liability

### A. First Cause of Action

The FEHA prohibits employment discrimination on the basis of a physical or mental disability. (Gov. Code, § 12940, subd. (a).) To prevail on a disability discrimination claim, a plaintiff must establish "that '"he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations[;] and (3) was subjected to an adverse employment action because of the disability or perceived disability."'" (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 926.) If any one of these elements is missing, the claim fails. (*Ibid*.; *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1006.)

### B. Second Cause of Action

The FEHA also prohibits harassment of an employee because of a physical or mental disability. (Gov. Code, § 12940, subd. (j)(1).) Whereas discrimination "refers to bias in the exercise of official actions on behalf of the employer," harassment involves "bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby v. McKesson Corp*. (2009) 47 Cal.4th 686, 707.) Disability harassment claims require a showing ""'"that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [disability].""'" (*Cornell v. Berkeley Tennis Club*, *supra*, 18 Cal.App.5th at p. 927.)

### C. Third and Fourth Causes of Action

"In addition to setting forth a general prohibition against unlawful employment discrimination based on disability, FEHA provides an independent cause of action for an

employer's failure to provide a reasonable accommodation for an applicant's or employee's known disability." (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 241, citing Gov. Code, § 12940, subds. (a), (m).) "Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself" (*Moore*, at p. 241), hence plaintiff's fourth cause of action. "Similar reasoning applies to violations of [Government Code] section 12940, subdivision (n), for an employer's failure to engage in a good faith interactive process to determine an effective accommodation, once one is requested" (*Moore*, at p. 242), i.e., plaintiff's third cause of action. "While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other." (*Ibid.*)

### D. Fifth Cause of Action

"Government Code section 12940, subdivision (h) makes it an unlawful employment practice for an employer to retaliate against an employee because that employee opposed any practice forbidden by FEHA or because the employee filed a complaint, testified, or assisted in any proceeding under FEHA." (*Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 722.) "[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

The pleadings alleged plaintiff engaged in a protected activity by complaining to defendant "about Cantu's illegal hiring and the discrimination, harassment and retaliation suffered by her …." After defendant succeeded in excluding the evidence of "Cantu's illegal hiring," the fifth cause of action became redundant. It was barely mentioned in plaintiff's opening statement and omitted entirely from her closing argument. As

conveyed to jurors through the jury instructions, the theory was defendant "retaliated against her for being a disabled person."

### E. Sixth Cause of Action

Plaintiff's sixth cause of action, labeled as "Failure to Prevent & Investigate Discrimination, Harassment, and Retaliation …," was derivative of her first, second, and fifth causes of action. (See Gov. Code, § 12940, subds. (j)(1), (k); *Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 880 ["the employee has no cause of action for a failure to investigate unlawful harassment or retaliation, unless actionable misconduct occurred"].)

## III. Jury Instructions and Verdict Form

CACI No. 2540 sets forth the elements of a disability discrimination claim under the FEHA. The instruction is replete with bracketed components, and the Directions for Use are detailed. The parties used CACI No. 2540 as a template to create the following jury instruction:

> "[Plaintiff] claims that [defendant] discriminated against her based on her physical or mental disability. To establish this claim, [plaintiff] must prove all of the following:
>
> "1. That [defendant] was an employer;
>
> "2. That [plaintiff] was an employee of [defendant];
>
> "3. That [defendant] knew that [plaintiff] had a physical or mental disability that limited her ability to perform her essential job duties;
>
> "4. That [plaintiff] was able to perform the essential job duties with reasonable accommodation for her physical or mental disability;
>
> "5. That [defendant] disciplined [plaintiff], denied her an available job position for which she was qualified, or terminated her employment;
>
> "6. That [plaintiff]'s physical or mental disability was a substantial motivating reason for [defendant]'s discipline, denial of an available job position, or decision to terminate her employment;
>
> "7. That [plaintiff] was harmed; and

22.

"8.  That [defendant]'s conduct was a substantial factor in causing [plaintiff]'s harm."

The wording of both the parties' instruction and the standard version of CACI No. 2540 assumes the employee is disabled for purposes of the FEHA.  The focus, therefore, is on the employer's knowledge of the disability and whether the employee was otherwise capable of performing the essential functions of her job.  (See *Green v. State of California* (2007) 42 Cal.4th 254, 262 ["the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation"].)  However, the Directions for Use accompanying CACI No. 2540 advise, "If the existence of a qualifying disability is disputed, additional instructions defining 'physical disability,' 'mental disability,' and 'medical condition' may be required.  (See Gov. Code, § 12926(i), (j), (m).)"  The jury below was *not* instructed on the FEHA's definitions of physical and mental disability (or medical condition).  As explained in footnote 3, *ante*, the existence of a "medical condition" was not at issue.

Whether plaintiff had a qualifying disability was very much in dispute at trial.  The defense argued, "The big issue in this case, with regard to what [plaintiff] has to prove, is she had a physical, mental disability that affected her ability to perform the essential job requirements, that affected her ability to do her job.  There is no evidence.  There is no evidence that she had a disability that affected her ability to do her job.  No doctor said that.  And, in fact, [plaintiff] said just the opposite.…"

In the respondent's brief, defendant argues plaintiff is now seeking "to hold the jurors accountable for not knowing the definition of a disability as defined by FEHA."  Defendant further argues the jurors' presumptive reliance on their lay understanding of what it means to be physically or mentally disabled was plaintiff's own fault.  The same argument is made with regard to the wording of the dispositive question on the special verdict form.  We agree that if any errors occurred in this regard, they do not inure to plaintiff's benefit on appeal.  (See *Davis v. Harano* (2022) 79 Cal.App.5th 688, 692 [if counsel's "jury instructions and verdict form led the jury astray, … [counsel] invited the

23.

error, if error there was"]; *Drink Tank Ventures LLC v. Real Soda in Real Bottles*, *Ltd.* (2021) 71 Cal.App.5th 528, 543–544 [discussing how "such errors may be forfeited, waived, or found to be invited error or the subject of estoppel"]; *Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1039 ["If appellant claimed, for the first time on appeal, that the special verdict form or its questions were defective, the issue would be deemed waived"].)

"In a civil case, the parties must propose complete and comprehensive instructions in accord with their theories. If they do not, the court has no duty to instruct on its own motion." (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 162; accord, *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131; *Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526 ["nor is it obligated to modify proposed instructions to make them complete or correct"].) "'[T]he exception is a complete failure to instruct on material issues and controlling legal principles which may amount to reversible error.'" (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 28.)

Plaintiff emphasizes she is neither alleging instructional error nor claiming the verdict form was defective. She argues the jurors' adverse finding, made despite the allegedly conclusive nature of her evidence, shows "an additional jury instruction providing a hyper-technical definition of disability … would not have assisted the jury." In other words, she contends any error in failing to instruct on the FEHA's definitions of physical and mental disability was harmless.

Given plaintiff's position, we need not determine whether a prejudicial instructional error occurred. As we explain, the jury acted within its authority by finding in favor of defendant. To be clear: the issue is not whether the evidence showed plaintiff had a disability within the meaning of Government Code section 12926, subdivision (j) and/or (m). The dispositive inquiry, as narrowed by the parties' verdict form, is whether the evidence could only have been interpreted as showing plaintiff had an actual "physical or mental disability that limited her ability to perform her essential job duties."

24.

## IV. Standard of Review

Plaintiff frames the issue as a typical sufficiency-of-the-evidence challenge. Such claims involve "'a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below.'" (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.) "Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value." (*Ibid.*) Plaintiff further notes "the daunting burden placed on one who challenges the sufficiency of the evidence to support a trial court finding." (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329; accord, *Multani v. Knight* (2018) 23 Cal.App.5th 837, 857.)

The standard of review is more stringent than discussed in either party's briefing. When a jury determines "that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This is because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.) "Where, as here, the judgment is against the party who has the burden of proof, it is *almost impossible* for him to prevail on appeal by arguing the evidence compels a judgment in his favor. That is because unless the [jury] makes specific findings of fact in favor of the losing plaintiff, we presume [it] found the plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486, italics added (*Bookout*); accord, *Estes v. Eaton Corporation* (2020) 51 Cal.App.5th 636, 651; *Fuller v. Department of Transportation*, *supra*, 38 Cal.App.5th at p. 1039.)

"Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the

appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' *and* (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Shaw v. County of Santa Cruz, supra*, 170 Cal.App.4th at p. 279, italics added; accord, *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) "We apply the usual rule on appeal that the trier of fact is not required to believe the testimony of any witness, even if uncontradicted." (*Bookout, supra*, 186 Cal.App.4th at p. 1487.) "All legitimate and reasonable inferences are indulged in order to uphold the verdict if possible." (*Goodman v. Zimmerman* (1994) 25 Cal.App.4th 1667, 1678.)

## V. Evidence of Physical Disability

### A. Dr. Dellica's Testimony

Dr. Dellica testified to being plaintiff's primary care physician from October 2012 through the time of trial. Her area of expertise is internal medicine. Although she confirmed five office visits with plaintiff between January 2013 and May 2014, Dr. Dellica had scant recollection of any information related to those visits. For example, in May 2014 she wrote a note excusing plaintiff from work for "medical reasons." When asked "what those medical reasons were," her only explanation was, "[my records show] a visit at that time. I had an office visit for her at that time."

Dr. Dellica authenticated the handwritten note dated January 8, 2013, listing the conditions of "[c]hronic fatigue syndrome, fibromyalgia, depression, reactive airway disease, allergic rhinitis, diabetes type two, [and] gastroesophageal reflux disease." On the same date, she referred plaintiff to an unidentified specialist for further evaluation/treatment of fibromyalgia, chronic fatigue syndrome, and allergic rhinitis. Plaintiff's counsel asked, "[W]hat symptoms was [plaintiff] having to make you conclude she was suffering from all of those [health] conditions." The witness answered, "Chest fatigue, musculoskeletal pain."

26.

No further testimony was provided to explain how any of the conditions listed on the note manifest themselves—in general or as specifically experienced by plaintiff—or how they may have affected plaintiff's job performance. Dr. Dellica was never asked to assess plaintiff's ability to perform the essential functions of her job, and she had no opinions to offer on the subject. No testimony was provided regarding any medications plaintiff may have been taking while under her care.

Dr. Dellica was briefly questioned about plaintiff's hiatal hernia surgery. When asked to explain "what a hiatal hernia is," she replied, "Hiatal hernia is part of the stomach protrudes through the esophagus. And—" Plaintiff's counsel interrupted the response to ask, "Is it painful?" Dr. Dellica replied, "Yes." She was unable to provide any details about the surgical procedure, and the unidentified surgeon did not testify.

On cross-examination, Dr. Dellica was asked about a statement plaintiff had made in deposition:

> "[DEFENDANT'S COUNSEL:] Q. [Plaintiff] said you told her she had a disability. Do you remember ever telling her she had a disability?
>
> "[DR. DELLICA:] A. It depends on how you say a disability. If a sickness or illness is a disability, like it depends on how you perceive disability.
>
> "Q. Sure. But as you sit here today, do you remember ever telling her she had a disability?
>
> "A. I can't remember."

**B.    Analysis**

Plaintiff argues Dr. Dellica "provided substantial and uncontroverted testimony confirming her diagnoses of chronic fatigue syndrome, fibromyalgia, depression, reactive airway disease, allergic rhinitis, type two diabetes type [*sic*], and gastroesophageal reflux disease." We address the listed conditions seriatim.

Aside from reading the words from her handwritten note, Dr. Dellica gave no testimony regarding "chronic fatigue syndrome." In her reply brief, plaintiff argues the

condition "is self-explanatory—a person frequently feels tired." Assuming this is true, there was no evidence plaintiff experienced, or complained of, tiredness at work. Nor did plaintiff allege tiredness was the reason for her persistent tardiness.

The record indicates Dr. Dellica relied on plaintiff's own self-reporting of her symptoms. If the jury doubted plaintiff's credibility, it was within its authority to reject the diagnosis of chronic fatigue syndrome. (See *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632 ["'expert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary'"]; *Lauderdale Associates v. Department of Health Services* (1998) 67 Cal.App.4th 117, 127 ["the trier of fact is the exclusive judge of credibility and may reject expert testimony in favor of nonexpert testimony or other evidence"].) Even assuming the jury accepted the diagnosis, the evidence did not compel a finding the condition limited plaintiff's ability to perform the essential functions of her job. Jurors likely questioned why and how, if plaintiff was chronically fatigued, she often went out dancing on weeknights and—according to her own testimony—routinely woke up at 5:30 a.m. despite not having to be at work until 7:30 a.m. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890 [jurors are generally free to reject uncontradicted expert testimony "*in toto*" and draw their own inferences from "the other evidence in the case"].)

Dr. Dellica's testimony did connect the diagnosis of chronic fatigue syndrome to plaintiff's evidently self-reported symptoms of chest fatigue and musculoskeletal pain. However, "[p]ain alone does not always constitute or establish a disability. [Citations.] An assessment must be made to determine how, if at all, the pain affects the specific employee." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 348; see *id*. at p. 349 [employee's diagnosis of carpal tunnel syndrome "does not mean he had a physical disability"]; *Leatherbury v. C&H Sugar Co., Inc.* (N.D.Cal. 2012) 911 F.Supp.2d 872, 880 ["Although pain can be a disability under FEHA, it must actually limit the employee's ability to work"].) No such assessment was made in this case, and plaintiff

28.

herself did not allege that pain limited her ability to perform the essential functions of her job.

Next on the list is fibromyalgia. The record is devoid of any evidence regarding what this is or how it affected plaintiff. As such, the jurors may have justifiably ignored the diagnosis and/or rejected it based on their lay understanding of the term. (See *Revels v. Berryhill* (9th Cir. 2017) 874 F.3d 648, 656 [noting "'[t]here used to be considerable skepticism that fibromyalgia was a real disease,'" even "'within much of the medical community'"].) To the extent jurors understood and accepted the diagnosis, they may have known "[t]he condition is diagnosed 'entirely on the basis of the patients' reports of pain and other symptoms.'" (*Ibid*.) The probative value of the evidence would have thus turned on the jury's assessment of plaintiff's credibility.

With regard to depression and anxiety, those conditions are generally viewed as mental disabilities. (See *Jadwin v. County of Kern* (E.D.Cal. 2009) 610 F.Supp.2d 1129, 1176–1177.) Although she listed them in her note of January 8, 2013, Dr. Dellica testified she was unqualified to opine about any psychological or emotional causes of plaintiff's health problems. Her testimony also failed to identify any symptoms of plaintiff's depression and anxiety. Those conditions were the focus of Dr. Ortiz-Nance's testimony, which we address in the final section of the opinion.

Next is "reactive airway disease and allergic rhinitis." As defendant observes, Dr. Dellica did not explain what those terms mean, "what body parts were affected, how [the conditions] were or were not controlled through the use of medication, or how they may have affected [plaintiff] in general, particularly her ability to do her job." Assuming the jury's familiarity with these afflictions, there was no evidence of plaintiff experiencing allergy- or asthma-like symptoms that limited her ability to perform the essential functions of her job. Dr. Dellica did reference plaintiff's self-reported symptoms of chest fatigue and musculoskeletal pain, but general allegations of pain do

not conclusively prove the existence of a physical disability. (*Arteaga v. Brink's*, *Inc.*, *supra*, 163 Cal.App.4th at pp. 348–349.)

Moving on to diabetes, this affliction is statutorily recognized as being within the FEHA's definition of a physical disability. (Gov. Code, § 12926.1, subd. (c).) However, Dr. Dellica's diagnosis of "diabetes type two" did not irrefutably show plaintiff had a qualifying disability within the parameters narrowed by the parties' verdict form. (See *Holtzclaw v. Certainteed Corp.* (E.D.Cal. 2011) 795 F.Supp.2d 996, 1017 [rejecting the proposition that "any diabetic person could meet the burden of establishing a disability by virtue of diagnosis alone"].) There was no evidence to suggest plaintiff's diabetes impacted her ability to perform the essential functions of her job.

Lastly, Dr. Dellica's note referred to gastroesophageal reflux disease (GERD). There was no testimony about this disease or its associated symptoms. Assuming some jurors were familiar with GERD from their own life experience, there was no evidence of how the condition affected, or even potentially affected, plaintiff's ability to perform the essential functions of her job.

In her reply brief, plaintiff focuses on the January 2014 surgery. She argues "Dr. Dellica explained in great detail the hiatal hernia and need for surgery." The statement is not accurate.

Dr. Dellica merely testified, "Hiatal hernia is part of the stomach protrudes through the esophagus," and she responded affirmatively when asked if the condition is painful. Evidence of a painful condition does not necessarily establish a qualifying disability. (*Arteaga v. Brink's*, *Inc.*, *supra*, 163 Cal.App.4th at pp. 348–349.) Plaintiff's counsel *attempted* to show the hiatal hernia and surgery were somehow related to plaintiff's GERD, but the effort failed. The relevant exchange occurred on direct examination:

> "[PLAINTIFF'S COUNSEL:] Q. And you had—was she having surgery for any other parts of her body during the time she was having this hiatal hernia surgery?

"[DR. DELLICA:] A.  Can you say it again?

"Q.  Yes.  I'm not good with medical terms.  But was she having some sort of band put around her esophagus to keep acid from going up her throat?

"A.  It's the surgeon's procedure.  So I'm not—it is not my expertise.

"Q.  Did the surgeon and your office have communications about her surgery?

"A.  Whatever I have, that's all the communication.

"Q.  That's fine.  Dr. Dellica, do you still treat [plaintiff] for those same conditions?

"A.  Yes.

"Q.  The conditions that are in the January 8, 2013, doctor's note?

"A.  Yes."

Plaintiff has repeatedly alleged her surgery involved "placing a band around her esophagus to keep acid from going up her throat."  However, her attorney's questions are not evidence.  (*People v. Flinner* (2020) 10 Cal.5th 686, 717; *Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 998.)  The jury was instructed on this principle pursuant to CACI No. 5002.  Counsel's assertion may very well be true, but it is not supported by actual evidence.

Furthermore, Dr. Dellica did not testify the surgery was medically necessary.  The only evidence on that point was Cantu's testimony before the school board, which was admitted at trial, wherein he claimed plaintiff had previously "shared with [him] that she might have *elective* surgery."  (Italics added.)  The fact plaintiff had surgery does not conclusively prove she had a qualifying disability.  (See *Avila v. Continental Airlines, Inc*. (2008) 165 Cal.App.4th 1237, 1249 ["Plaintiff might have been hospitalized for reasons other than disability—for example, he might have had minor elective surgery, or he might have sought preventive treatment for some other condition that was not disabling"].)

31.

If plaintiff is now claiming she was temporarily disabled based on a physical condition *attributable to the surgery itself*, that was not the theory advanced at trial and it may be treated as forfeited on appeal. (Cf. *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 318 ["The jury's verdict cannot be upheld based on legal or factual theories that were not advanced below"].) We are disinclined to consider it given plaintiff's failure to request an instruction on the legal definition of "disability" and her trial strategy of pursuing a haphazard shotgun approach to the issue. (See *Richmond v. Dart Industries*, *Inc*. (1987) 196 Cal.App.3d 869, 878–880.) She relied on a list of sundry health conditions without ever articulating how any of the conditions rendered her physically disabled.

Dr. Dellica's note of January 8, 2013, was the linchpin of the physical disability theory. Hiatal hernia was not among the listed maladies. The surgical recovery period in 2014 was discussed at trial, but the notion of plaintiff's temporary postsurgical condition being a disability in and of itself was only subtly implied, if at all. "Having failed to tender [the alternative] theory with reasonable clarity to the jury, [she] waived the theory and may not try the case anew." (*Richmond v. Dart Industries*, *Inc*., *supra*, 196 Cal.App.3d at p. 880.)

Forfeiture aside, the evidence of plaintiff's surgical recovery did not conclusively establish a qualifying disability. There was no evidence of what the procedure entailed or the expected recovery time for the average patient. Plaintiff erroneously contends "Dr. Dellica testified the hiatal hernia surgery required [her] to miss work for two months." Conspicuously absent from this assertion is a supporting record citation. Dr. Dellica gave no such testimony.

The evidence showed plaintiff requested a two- to four-week leave of absence to recover from her surgery. This did not irrefutably prove the time off was medically necessary. Superintendent Robles testified, "When she notified us that she was going to have surgery we said fine. That's how—I mean, there wasn't a stamp or an approval or

32.

anything, like, statement. We just, you know, accepted the notice, and we noted that she'll be gone. And that's what we did."

Plaintiff produced a document from her surgeon's office dated January 23, 2014. The preprinted form had a checked box next to a line reading, "Released for regular work _____." In the blank space was a handwritten date: "2/17/14." Nobody from the surgeon's office testified about the note, and the jury could reasonably infer the surgeon's reliance on plaintiff's self-reporting of her postsurgical symptoms. The same is true of Dr. Dellica's note dated February 14, 2014, which said, "Excuse from work from 2/18/14 until 3/09/14 due to medical reasons. [¶] Return to work on 3/10/14."

Most of Dr. Dellica's notes used the phrase "for medical reasons," but the "reasons" were not explained in her testimony. However, she did say, "Whatever I write, the patient asks for it, I give it to them. That is my standard of practice." This testimony, along with her excusing plaintiff from work in July 2013, during the same week plaintiff was moving out of her apartment and traveling out of town for a wedding, may have diminished the probative value of her notes in the eyes of the jury. Jurors may have also questioned why plaintiff asked Dr. Dellica to vouch for the extension of her postsurgical leave instead of obtaining a note from the surgeon's office.

Plaintiff testified, "I was having trouble walking and I couldn't straighten up after the surgery. I was in a lot of pain, and I was on a liquid diet. I couldn't eat solid foods for over four weeks." Like much of her other testimony, the statements were uncorroborated and the jury was free to disbelieve them. (See Evid. Code, § 780, subd. (f) [in determining a witness's credibility, the jury may consider his or her interest in the outcome of the case]; *Young v. Tassop* (1941) 47 Cal.App.2d 557, 562 ["One matter discrediting the testimony of a witness is that, if the jury find a witness wilfully false in one material part of his testimony, on which he is contradicted, they may disbelieve his testimony in other respects, though not contradicted"].) We presume the jury concluded

33.

plaintiff's testimony lacked "sufficient weight and credibility to carry the burden of proof." (*Bookout*, *supra*, 186 Cal.App.4th at p. 1486.)

### C. Plaintiff's Testimony

In arguing for reversal, plaintiff additionally relies on her own testimony and prior statements. As discussed, the jury was free to disbelieve all or part of her testimony. For our purposes, the most relevant evidence was plaintiff's deposition testimony: "I had a disability, but it didn't affect my ability to do my job." (See *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926 ["'[T]he appellate court ordinarily *looks only at the evidence supporting the successful party*, *and disregards the contrary showing*.' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent"].)

Plaintiff's quoted testimony "has the conclusive effect of a judicial admission that [her] physical condition did not render difficult the achievement of [the relevant] major life activity," i.e., working. (*Gelfo v. Lockheed Martin Corp.*, *supra*, 140 Cal.App.4th at pp. 47–48.) "A judicial admission is a party's unequivocal concession of the truth of a matter, and removes the matter as an issue in the case. [Citations.] This principle has particular force when the admission hurts the conceder's case. An express concession against one's interest is regarded as highly competent, credible evidence." (*Id.* at p. 48.) The jury was not obligated to credit plaintiff's belated attempt to qualify the admission at trial. (See, e.g., *Enis v. Specialty Auto Sales* (1978) 83 Cal.App.3d 928, 940 [defendant's testimony "was self-serving in nature and the jury was at liberty to disbelieve it"].)

## VI Evidence of Mental Disability

Dr. Ortiz-Nance is a psychologist to whom plaintiff was referred in December 2014, approximately six months into the period of involuntary administrative leave from her job. Plaintiff was initially seen by an intern who administered a standardized psychological examination (the "MMPI-2") and concluded plaintiff had "persistent depressive disorder with anxious distress" (the depression diagnosis) and "PTSD." After three sessions with the intern, plaintiff began seeing Dr. Ortiz-Nance on a weekly basis.

34.

Dr. Ortiz-Nance testified to agreeing with the depression diagnosis based on the MMPI-2 test results and his own "behavioral observation in the office." He described the condition as "a type of low grade depression" that psychologists "don't tend to start looking at diagnosing … unless they can verify [the patient has been experiencing symptoms] for at least a year." According to the testimony, symptoms can include lethargy, lack of motivation, and feeling "like you don't have the energy to sometime get out of bed [*sic*]."

Plaintiff's opening statement at trial, her closing and rebuttal arguments, and her examination of Dr. Ortiz-Nance indicate the main reason for having him testify was to support a claim of emotional distress damages. In her appellate briefing, plaintiff contends the quoted testimony about the depression diagnosis proved she had a mental disability. Although not expressly argued, she implies the testimony explained her chronic tardiness in the mornings.

When cross-examined by the defense, Dr. Ortiz-Nance conceded the MMPI-2 is supposed to be administered by a licensed psychologist. His intern was not licensed when she evaluated plaintiff, and she initially failed to administer all of the test questions. Although the expert testified these irregularities did not affect his opinions, the jury may have found them significant.

Without belaboring the point, "The jury is not required to accept an expert's opinion. The final resolution of the facts at issue resides with the jury alone." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.) The jury could have discredited Dr. Ortiz-Nance's testimony based on the defense's cross-examination or simply because of "[h]is demeanor while testifying and the manner in which he testifie[d]." (Evid. Code, § 780, subd. (a).) And, of course, it could have determined the testimony was less convincing than plaintiff's admission that her alleged disabilities "didn't affect my ability to do my job." The expert's testimony did not conclusively prove the existence of a qualifying mental disability.

35.

**DISPOSITION**

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (See *Pollock v. Tri-Modal Distribution Services*, *Inc*. (2021) 11 Cal.5th 918, 950–951.)

                                                        PEÑA, J.

WE CONCUR:

HILL, P. J.

DETJEN, J.